UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,*<br>STATE OF CALIFORNIA, *ex rel.,*<br>STATE OF COLORADO, *ex rel.,*<br>STATE OF CONNECTICUT, *ex rel.,*<br>STATE OF DELAWARE, *ex rel.,*<br>DISTRICT OF COLUMBIA, *ex rel.,*<br>STATE OF GEORGIA, *ex rel.,*<br>STATE OF HAWAII, *ex rel.,*<br>STATE OF ILLINOIS, *ex rel.,*<br>STATE OF INDIANA, *ex rel.,*<br>STATE OF IOWA, *ex rel.,*<br>STATE OF LOUISIANA, *ex rel.,*<br>STATE OF MARYLAND, *ex rel.,*<br>COMMONWEALTH OF MASSACHUSETTS, *ex rel.,*<br>STATE OF MICHIGAN, *ex rel.,*<br>STATE OF MINNESOTA, *ex rel.,*<br>STATE OF MONTANA, *ex rel.,*<br>STATE OF NEVADA, *ex rel.,*<br>STATE OF NEW JERSEY, *ex rel.,*<br>STATE OF NEW MEXICO, *ex rel.,*<br>STATE OF NEW YORK, *ex rel.,*<br>STATE OF NORTH CAROLINA, *ex rel.,*<br>STATE OF OKLAHOMA, *ex rel.,*<br>STATE OF RHODE ISLAND, *ex rel.,*<br>STATE OF TENNESSEE, *ex rel.,*<br>STATE OF TEXAS, *ex rel.,*<br>STATE OF VERMONT *ex rel.,*<br>COMMONWEALTH OF VIRGINIA, *ex rel.,* and<br>STATE OF WASHINGTON, *ex rel.,*<br><br>DAVID GONZALEZ<br>11700 Old Columbia Pike, #709<br>Silver Spring, MD 20904<br><br>Plaintiff-Relator,<br><br>BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA,<br>THE STATES OF CALIFORNIA, COLORADO,<br>CONNECTICUT, DELAWARE, GEORGIA,<br>HAWAII, ILLINOIS, INDIANA, IOWA,<br>LOUISIANA, MARYLAND, MICHIGAN, | CASE NO.:_____<br><br>**COMPLAINT**<br>**FILED UNDER SEAL**<br>PURSUANT TO<br>31 U.S.C. §3730(b)(2)<br><br>**JURY TRIAL**<br>**DEMANDED** |

MINNESOTA, MONTANA, NEVADA,                          )
NEW JERSEY, NEW MEXICO, NEW YORK,                    )
NORTH CAROLINA, OKLAHOMA,                            )
RHODE ISLAND, TENNESSEE, TEXAS, VERMONT              )
WASHINGTON,                                          )
THE COMMONWEALTH OF MASSACHUSETTS,                   )
THE COMMONWEALTH OF VIRGINIA,  and                   )
THE DISTRICT OF COLUMBIA                             )
                                                     )
c/o                                                  )
UNITED STATES ATTORNEY                               )
JOHN JOSEPH MOAKLEY                                  )
UNITED STATES COURTHOUSE                             )
1 COURTHOUSE WAY, SUITE 2300                         )
BOSTON, MA,02210                                     )
                                                     )
ATTORNEY GENERAL OF                                  )
THE UNITED STATES                                    )
U.S. Department of Justice                           )
10th and Constitution Avenue, N.W.                   )
Washington, DC 20530                                 )
                                                     )
ATTORNEY GENERAL FOR THE STATE OF                    )
CALIFORNIA                                           )
P.O. Box 944255                                      )
Sacramento, CA  94244-2250                           )
                                                     )
ATTORNEY GENERAL FOR THE STATE OF                    )
COLORADO                                             )
1300 Broadway 9th Floor                              )
Denver, CO  80203                                    )
                                                     )
ATTORNEY GENERAL FOR THE STATE OF                    )
CONNECTICUT                                          )
55 Elm Street                                        )
Hartford, CT 06106                                   )
                                                     )
ATTORNEY GENERAL FOR THE STATE OF                    )
DELAWARE                                             )
820 N. French Street                                 )
Wilmington, DE 19801                                 )
                                                     )
ATTORNEY GENERAL FOR THE                             )
DISTRICT OF COLUMBIA                                 )
441 4th Street NW, Suite 1060 N                      )
Washington, DC 20001                                 )

2

ATTORNEY GENERAL FOR THE STATE OF        )
GEORGIA                                  )
40 Capitol Square, SW                    )
Atlanta, GA 30334                        )
                                         )
ATTORNEY GENERAL FOR THE STATE OF        )
HAWAII                                   )
425 Queen Street                         )
Honolulu, HI 96813                       )
                                         )
ATTORNEY GENERAL FOR THE STATE OF        )
ILLINOIS                                 )
100 West Randolph Street                 )
Chicago, IL 60601                        )
                                         )
ATTORNEY GENERAL FOR THE STATE OF        )
INDIANA                                  )
Indiana Government Center South          )
302 W. Washington St., 5th Floor         )
Indianapolis, IN 46204                   )
                                         )
INSPECTOR GENERAL FOR THE STATE OF       )
INDIANA                                  )
315 WEST OHIO STREET                     )
Indianapolis, IN 46202                   )
                                         )
ATTORNEY GENERAL FOR THE STATE OF        )
IOWA                                     )
1305 E. Walnut Street, 2nd Floor    )
Des Moines, IA 50319                     )
                                         )
ATTORNEY GENERAL FOR THE STATE OF        )
LOUISIANA                                )
1885 North 3rd St                   )
Baton Rouge, LA 70802                    )
                                         )
ATTORNEY GENERAL FOR THE STATE OF        )
MARYLAND                                 )
200 St. Paul Place                       )
Baltimore, MD 212202                     )
                                         )
ATTORNEY GENERAL FOR THE                 )
COMMONWEALTH OF MASSACHUSETTS            )
One Ashburton Place                      )
Boston, MA 02108-1518                    )

3

)
ATTORNEY GENERAL FOR THE STATE OF            )
MICHIGAN                                     )
G. Mennen Williams Building, 7th Floor       )
525 W. Ottawa St.                            )
P.O. Box 30212                               )
Lansing, MI 48909                            )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
MINNESOTA                                    )
1400 Bremer Tower                            )
445 Minnesota Street                         )
St. Paul, MN 55101                           )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
MONTANA                                      )
Justice Building, Third Floor                )
215 North Sanders                            )
P.O. Box 201401                              )
Helena, MT 59620-1401                        )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
NEVADA                                       )
100 North Carson Street                      )
Carson City, NV 89701                        )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
NEW JERSEY                                   )
Richard J. Hughes Justice Complex            )
8th Floor, West Wing                         )
25 Market Street                             )
Trenton, NJ 08625-0080                       )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
NEW MEXICO                                   )
PO Box 1508                                  )
Santa Fe, NM 87504-1508                      )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
NEW YORK                                     )
120 Broadway, 24th Floor                     )
New York, NY 10271                           )
                                             )
ATTORNEY GENERAL FOR THE STATE OF            )
NORTH CAROLINA                               )

4

9001 Mail Service Center                              )
Raleigh, NC 27699-9001                                )
                                                      )
ATTORNEY GENERAL FOR THE STATE OF                     )
OKLAHOMA                                              )
313 NW 21st St                                        )
Oklahoma City, OK 73105                               )
                                                      )
ATTORNEY GENERAL FOR THE STATE OF                     )
RHODE ISLAND                                          )
150 South Main Street                                 )
Providence, RI 02903                                  )
                                                      )
ATTORNEY GENERAL AND REPORTER FOR THE                 )
STATE OF TENNESSEE                                    )
425 5TH Avenue                                        )
Nashville, TN 37243                                   )
                                                      )
ATTORNEY GENERAL FOR THE STATE OF                     )
TEXAS                                                 )
PO Box 12548                                          )
Austin, TX 78711-2548                                 )
                                                      )
ATTORNEY GENERAL FOR THE                              )
COMMONWEALTH OF VERMONT                               )
109 State Street                                      )
Montpelier, Vermont 05609                             )
                                                      )
ATTORNEY GENERAL FOR THE                              )
COMMONWEALTH OF VIRGINIA                              )
Office of the Attorney General                        )
900 East Main Street                                  )
Richmond, Virginia 23219                              )
                                                      )
ATTORNEY GENERAL FOR THE STATE OF                     )
WASHINGTON                                            )
1125 Washington Street, SE                            )
P.O. Box 40100                                        )
Olympia, WA 98504                                     )
                                                      )
v.                                                    )
                                                      )
DAVITA HEALTH CARE PARTNERS                           )
DAVITA KIDNEY CARE                                    )
2000 16th Street                                      )
Denver, Colorado 80202                                )

5

FRESENIUS MEDICAL CARE NORTH AMERICA  )
FRESENIUS KIDNEY CARE                 )
920 Winter Street                     )
Waltham, MA 02451                     )
                                      )
AMERICAN KIDNEY FUND                  )
11921 Rockville Pike #300,            )
Rockville, MD 20852                   )
                                      )
JOHN DOE 1-100                        )
                                      )
DEFENDANTS.                           )
_____)

1.   This is an action filed under the *qui tam* provisions of the Federal False Claims Act, 31

     U.S.C. Sec. 3729, *et seq*., by Plaintiff-Relator David Gonzalez, in the name of the United

     States and the governments of California, Colorado, Connecticut, Delaware, the District

     of Columbia, Georgia Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland,

     Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New

     York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia,

     Washington and himself to recover penalties and damages arising from the Defendants

     knowing direction of payments for End Stage Renal Services in a manner, which creates

     illegal remuneration and kickbacks and thereby false claims to the above listed

     governments.

2.   Accordingly, Plaintiff-Relator files this action to recover penalties and damages on behalf

     of himself and the above-listed governments.

## I.   JURISDICTION AND VENUE

3.   This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

4.   This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. §
     3732(a) and 28 U.S.C. § 1331, and supplemental and pendant jurisdiction.

5.   Plaintiff-Relator also brings this action on behalf of the governments of California,
     Colorado, Connecticut, Delaware, the District of Columbia, Georgia, Hawaii, Illinois,
     Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana,
     Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island,
     Tennessee, Texas, Vermont, Virginia and Washington, hereinafter referred to collectively
     as "the States."

6.   Plaintiff-Relator brings this action on behalf of the States for the Defendant's violations
     of Cal. Gov't Code §§ 12650 *et seq.;* Colo. Rev. Stat. §§ 25.4-4-303.4 *et seq.*; Conn. Gen.
     Stat. §§17b-301a--17b-301p (2010 supplement); Del. Code Ann. Tit.6. §§ 1201 *et seq.*;
     D.C. Code §§ 2-381.01 *et seq.;* Ga. Code. Ann. §§ 49-4-168 *et seq.;* Haw. Rev. Stat.
     Ann. §§ 661-21 *et seq.;* 740 Ill. Comp. Stat. Ann. 175/1 *et seq.*; Ind. Code §§ 5-11-5.5 *et
     seq.;* Iowa Code § 685.1 *et seq.*; La. Rev. Stat. Ann. §§ 6:438.1 *et seq.;* Md. Code Ann.
     Health-Gen. §§ 2-601 *et seq.;* Md. Code Ann. Gen. Prov. §§ 8-101 *et seq.;* Mass. Ann.
     Laws ch.12, §§ 5 *et seq.;* Mich. Comp. Laws. Serv. §§ 400.601 *et seq.;* Minn. Stat. §§
     15C.01 *et seq.;* Mont. Code Ann. §§ 17-8-401 *et seq.;* Nev. Rev. Stat. Ann. §§ 357.010 *et
     seq.;* N.J. Stat. Ann. §§ 2A: 32C-1 *et seq.*; N.M. Stat. Ann. §§ 27-14-1 *et seq.;* N.M. Stat.
     Ann. §§ 44-9-1 *et seq.* N.Y. State Fin. Law §§ 188 *et seq.;* N.C. Gen. Stat. §§ 1-605 *et
     seq.;* Okla. Stat. tit. 63, §§ 5053 *et seq.;* R.I. Gen. Laws §§ 9-1.1-1 *et seq.;* Tenn. Code
     Ann. §§ 4-18-101 *et seq.;* Tenn. Code Ann. §§ 71-5-181 *et seq.* 1993; Tex. Hum. Res.
     Code Ann. §§ 36.001 *et seq.;* Va. Code Ann. §§ 8.01-216.1 *et seq.;* 32 VSA §§ 630 *et
     seq.;* RCW 74.66.005 *et seq.*

7.     These laws hereinafter are collectively referred to as the "State False Claims Acts."

8.     Jurisdiction over claims arising under the State False Claims Acts is also conferred by 31 U.S.C. § 3732(b) in that the transactions and or occurrences described, which violate the State False Claims Acts involve a common nucleus of facts as, and are related to, those that violate the Federal False Claims Act.

9.     Venue is proper in this jurisdiction pursuant to 31 U.S.C. § 3732(a) because at least one Defendant maintains an office in this district, and regularly transacts business in this district and did so at all times relevant to this Complaint. The False Claims Act confers nationwide jurisdiction and at least one of the Defendants resides or regularly transacts business in this district.

## II.     PARTIES

10.    Plaintiff-Relator David Gonzalez, of 11700 Old Columbia Pike, #709, Silver Spring, MD 20904, worked for the American Kidney Fund for twelve years, until October 20, 2015, when he was forced out of the organization for questioning the practices detailed herein. He served as an "HIPP" or Health Insurance Premium Program, Patient Services Coordinator.

11.    There have been no prior public disclosures of allegations or transactions that are the subject of this Complaint as defined by the term "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A).

12.    Mr. Gonzalez is an original source of all the allegations contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B). Mr. Gonzalez has independent knowledge of all the information contained herein, and voluntarily provided such

information to the United States and the above listed States prior to filing an action in Court.

13.   Defendant DaVita Health Care Partners is a fortune 500 health care company traded on the New York Stock Exchange and the parent company of DaVita Kidney Care (hereinafter collectively "DaVita"). The company maintains headquarters at 2000 16th Street Denver, Colorado 80202. DaVita provides End Stage Renal Services including dialysis treatment. Its website includes a service whereby a patient seeking dialysis treatment can search by zip code and find a DaVita provider in any state in the United States as well as in Washington, DC.  DaVita claims to operate or provide administrative services at more than two thousand outpatient dialysis centers in the United States and DaVita regularly conducts business and has caused to be submitted some of the false claims at issue in this case in this district.

14.   Defendant Fresenius Medical Care provides Dialysis to almost three hundred thousand patients worldwide. International Headquarters are at 61346 Bad Homburg v.d. H. Germany, with subsidiaries including Fresenius Medical Care North America and Fresenius Kidney Care (hereinafter all referred to as "Fresenius") headquartered at 920 Winter Street Waltham, MA 02451. Fresenius also operates in all 50 states and the District of Columbia. Fresenius regularly conducts business and has caused to be submitted some of the false claims at issue in this case in this district.

15.   Defendant, American Kidney Fund ("AKF") of 11921 Rockville Pike #300, Rockville, MD, 20852 is a non-profit "501(c)(3)" corporation. The AKF raises money and provides public services including providing free screenings for kidney disease, education and advocacy on kidney related issues. The majority of funds raised by the AKF, however, go

to provide payment assistance for patients who need dialysis treatment for kidney conditions. The AKF's latest IRS Form 900 disclosure shows it obtained gross receipts of more than $275,000,000 in 2015. The AKF caused to be submitted some of the false claims at issue in this case in this district.

16.    In addition, the Plaintiff-Relator brings these claims against John Doe Defendants 1-100 which include, but are not limited to, six companies listed anonymously as Company A, Company B, Company C, Company D, Company E and Company F who along with the AKF are referred to as the "Requestors," in the 1997 Advisory Opinion 97-1 discussed fully below. The AKF 2015 IRS form 990 lists anonymous contributions from its six largest contributors, each such contributor providing a minimum of $6,000,000 with the largest contribution exceeding $100,000,000.

## III.    FACTUAL ALLEGATIONS

### A.    Introduction

17.    The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

18.    The Plaintiff-Relator worked for the American Kidney Fund ("AKF") for twelve years as a "HIPP" or Health Insurance Premium Program, Patient Services Coordinator. He discovered, that while the organization was set up to be a charity and certainly did provide funds on behalf of needy dialysis patients, the Defendants knowingly violated requirements that had been in place to ensure funds provided to the AKF and used to secure government health insurance and make copayments, did not become illegal remuneration and kickbacks.

19.    The intentional violations were committed in concert between the two largest dialysis providers in the world (i.e., Fresenius and DaVita) and AKF, thereby creating illegal

referrals and payments under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

**B.    OIG Requirements to create a fair payment structure and avoid kickbacks.**

20.    The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

21.    In 1997, AKF and several anonymous providers made certain representations to obtain an advisory opinion from the Department of Health and Human Services, Office of Inspector General ("OIG") on how to manage funds so as to avoid creating illegal incentives to any party in the process. It was plain that paying money to those who choose which dialysis treatment provider to use would otherwise be considered illegal remuneration.

22.    The AKF and several anonymous dialysis providers made specific material representations about how they would conduct themselves to the OIG, and the OIG relied on those representations in rendering its advisory opinion.

23.    The representations made by the AKF and several providers were stated in an advisory opinion issued in 1997 by the U.S. Department of Health and Human Services, Office of Inspector General ("OIG") which, based on those representations, placed specific conditions on the conduct of the AKF and any of the providers who made donations for the purpose of providing patient assistance.

24.    The 1997 OIG advisory opinion made clear its purpose was to determine if there was a structure under which such payments would not create kickbacks:

> We are writing in response to your request for an advisory opinion, which we accepted pursuant to 42 C.F.R. § 1008.41 on April 11, 1997. Your request asks whether donations by renal dialysis providers to an independent 501(c)(3) charitable organization for the purpose of funding a program to pay for Supplementary Medical Insurance Program ("Medicare Part B") or Medicare Supplementary Health Insurance ("Medigap") premiums for financially needy Medicare beneficiaries with end-stage renal disease, where such beneficiaries may be receiving treatment from

the donor-dialysis providers (The "Proposed Arrangement") would constitute grounds for the imposition of a civil monetary penalty under Section 231 (h) of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

OIG, Advisory Opinion 97-1, p. 1.

25.     The AKF and the other six so called "Requestors" listed as Company A, Company B, Company C, Company D, Company E and Company F in the OIG Advisory Opinion 97-1 made representations to the Office of Inspector General, which are recounted in the opinion.

26.     Defendants DaVita and Fresenius are believed to have been among the providers that anonymously also sought the opinion.

27.     Additionally, Defendants DaVita and Fresenius each have been major contributors to the AKF and are aware of OIG Advisory Opinion 97-1 going forward.

28.     Each Defendant that provided funding to AKF was required to ensure that the OIG Advisory Opinion 97-1 and other requirements to prevent illegal kickbacks were followed and to be sure that any funds paid to AKF and subsequently received by patients from the AKF were not illegal remuneration.

29.     The OIG Advisory Opinion discussed the makeup of board members and committees within the AKF and how that was done to insulate the AKF from any specific companies who were also requestors of the opinion, or donors to the AKF, but who had former executives serving with the AKF. In addition, the OIG noted:

> AKF's Health Insurance Premium Program ("HIPP") provides financial assistance to financially needed ESRD [End Stage Renal Dialysis] patients for the costs of medicine, transportation, and health insurance premiums, including Medicare Part B and Medigap Premiums. Assistance is available to all eligible patients on an equal basis. In general, eligibility for participation in AKF's assistance programs requires a physician certification, a referral letter signed by a social worker or administrator at

> a dialysis provider, and an individual Patient Grant Application. The Patient Grant Application requires patients to provide detailed financial information for their entire household.
>
> While a patient can apply directly to AKF for a grant, most applications are submitted on the patient's behalf by dialysis providers or social workers employed by a dialysis provider.
> …
> All determinations are made by AKF employees who have no financial interest in the companies or other dialysis providers and are based on their good faith assessment that the applicant is in financial need and eligible for assistance.
> …
> Because of AKF's limited financial resources, an AKF patient assistance grant is provided for a specific time period. Upon expiration of the period, the patient must submit another grant application. Grant requests are reviewed on a first-come, first served basis to the extent funding is available.

OIG, Advisory Opinion 97-1, pp. 3-4 [emphasis added].

30. This was the status of the program according to the OIG as stated by the requestors prior to acceptance of their proposal to the Office of Inspector General.

31. The Requesters including the AKF and the unnamed companies wanted to expand the program and the OIG reported in a section of the report entitled "The Proposed Agreement" that:

> AKF proposes to expand significantly its patient assistance grants to financially needy ESRD [End Stage Renal Dialysis] patients for payment of medical insurance premiums through HIPP. Additional funding will be donated primarily by the companies.

OIG, Advisory Opinion 97-1, p.4.

32. While medical social workers could assist patients in identifying "all available sources of assistance…" that still precluded the companies from advertising the availability of the possibility of financial assistance to the public or disclosing to individual patients they refer that such members contributed to the AKF to fund these grants. *See* OIG, Advisory

Opinion 97-1, p.4.

33.   Specific promises to keep the AKF decision-making and the funders separate were made

part of the requirements of this opinion, including:

> AKF will continue to use its current procedures in assessing the financial
> need and eligibility of all patients, whether self referred or referred by the
> Companies, or other non-donor dialysis providers. Determination will be
> made solely on AKF's good faith assessment of a patient's financial need.
> AKF staff involved in awarding patient grants will not take the identity of
> the referring facility or the amount of any provider's donation into
> consideration when assessing patient applications or making grant
> determinations.

> Under the Proposed Agreement, the Companies will be free to determine
> whether to make contributions to AKF and, if so, how much to contribute.
> All the Companies have certified that they will not track the amount that
> AKF pays on behalf of patients dialyzing at their facilities in order to
> calculate future contributions. However, in calculating their contributions
> to AKF, the Companies have indicated that they may consider what they
> would have otherwise paid on behalf of financially needy patients utilizing
> their facilities…The Companies will not disclose to each other, or other
> dialysis providers, the amount or method of calculating their respective
> contributions to AKF, and AKF will not disclose one Company's
> contribution to another company or to other dialysis providers.

> Contributions will be made without any restrictions or conditions placed
> on the donation. The Companies have acknowledged that "contributions
> …will be gifts without any guarantee or promise on the part of AKF that
> patients referred to AKF for possible financial assistance with their
> insurance premiums will receive such assistance. AKF's discretion as to
> the uses of contributions will be absolute, independent, and autonomous."

OIG, Advisory Opinion 97-1, pp. 4-5.

34.   Not surprisingly, based upon, and explicitly subject to, these representations by the AKF

and the providers, the OIG determined that the proposed scheme would not constitute

illegal remuneration:

> …while the premium payments by AKF may constitute remuneration to
> beneficiaries, they are not likely to influence patients to order or receive
> services from particular providers. To the contrary, the insurance coverage
> purchased by AKF will follow a patient regardless of which provider the

14

patient selects, thereby enhancing patient freedom of choice in health care providers.

OIG, Advisory Opinion 97-1, p.5.

35.   In addition in 1998, the OIG issued an advisory opinion following similar reasoning forming the basis for an unnamed dialysis provider and an unnamed charity to provide assistance to patients. The charity could receive funds and the provider could donate, but such payments to patients and donations could not be tracked to the provider. *See* OIG, Advisory Opinion, 98-17.

36.   In 2002, the OIG considered whether to change this structure and whether an exception to the requirement should be allowed for dialysis providers to support premium payments for patients directly. *See* 67 Fed. Reg. 236 (Dec. 9, 2002).

37.   Although the proposed exception purported to limit such payments to those patients whom the providers could determine to be needy and to providers that did not regularly partake in such payments, the OIG rejected this proposed rule stating:

> First the direct payment of supplemental premiums by ESRD providers for financially needy patients carries the same potential for abuse as the provision of free or below market rate goods or services by any other health care provider...In short, the exception would promote the very conduct the statute prohibits: the offering of remuneration to influence the selection of a provider. Moreover, patients would not only be influenced to select ESRD facilities that buy them supplemental health insurance, but would be "locked in" to those facilities, since changing facilities would jeopardize their supplemental insurance for all services, including substantial non-ESRD services.
>
> Second, creating an exception for direct premium payments by ESRD providers would create demands for additional exceptions for comparable payments by other health care providers and would potentially increase federal expenditures and Medigap premiums. We can discern no rational basis--and Congress has provided no guidance--for distinguishing between providers paying premiums for ESRD patients and providers paying premiums for other chronically ill, financially needy patients, such as patients with cancer, diabetes, or congestive heart disease. Nor can we

discern any rational bases for distinguishing among types of benefits provided to Medicare and Medicaid beneficiaries or among categories of sick beneficiaries. Absent congressional guidance, attempting to draw such distinctions would necessarily result in arbitrary standards and would undermine the statute.

It is to a provider's financial advantage (i) to pay the Medigap premium whenever the premium is less than the expected copayments and (ii) to pay the Part B premium whenever the premium is less than the expected Part B payments. Thus, the insurer will always lose money on these policies, as the amount paid out to the provider will always exceed the premiums received. This phenomenon-adverse selection-will likely cause insurers to raise premiums for all other enrollees to cover the losses. For this reason, the health insurance industry objected to the proposed exception.

67 Fed. Reg. 236, pp. 72897-8 (Dec. 9, 2002).

38.     Notably, in rejecting this proposed rule the OIG relied on the representations of AKF and

Companies A-F, who submitted the request that resulted in OIG Advisory Opinion 97-1,

that the arrangements between these providers and the AKF were independent and

operating lawfully, when the OIG concluded:

Finally, we are not persuaded that a special exception for ESRD premium payments is needed. Financially needy dialysis patients are already receiving, and will continue to receive, supplemental health insurance support through funding arrangements with AKF or comparable independent nonprofit organizations. These arrangements are lawful, are apparently efficient, and minimize the potential for abuse.

Id.

39.     In 1997, when the opinion sought by the AKF, was issued, the charity reported assisting

12,000 patients with End Stage Renal Dialysis and receiving some $5,000,000 in

donations. It has been almost twenty years since then, and the AKF has grown

considerably, to an entity with $275,000,000 in gross receipts in 2015.

40.     The AKF provided funds to support treatment for 93,000 patients in 2015, a large portion

of those funds were used to pay for Medicare Part B payments or Medigap payments or

to participate in some form of insurance to cover co-payments with public health plans of some kind thereby facilitating government payments to the providers.

C.   **Defendants Willfully Violated the OIG's Requirements and Used Kickbacks.**

41.   The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

42.   The Plaintiff-Relator learned that the Defendants eventually violated virtually every material representation made to obtain the OIG advisory opinion, which thereby became essential requirements to avoid liability for paying kickbacks.

43.   Plaintiff-Relator learned that specific providers were involved in the process with the AKF as well, in direct violation of the requirements of the Advisory Opinion, thereby creating a scheme, which provided illegal remuneration to patients and created incentives for, if not conditions requiring, those patients to use only those providers who contributed to the fund rather than those who do not.

44.   Indeed, the coverage did not follow the patient, but was subject to the provider's donations, which were tracked by the AKF.

45.   In fact, the improper processes put into place, which violate the OIG Opinion came as a result of complaints by Fresenius and DaVita to the AKF.

46.   These facts demonstrate that Defendants are knowingly violating the restrictions imposed by the OIG to avoid kickbacks.

47.   The Plaintiff-Relator's position put him into regular and direct contact with many officials of the AKF.  For example, Dennis Cooper was the Relator's direct supervisor and was the HIPP manager.  Mr. Cooper reported to Jeremy Abundy, Director of Patient Services.

48.     Gwen Dewberry was Mr. Abundy's boss and served as Senior Director of Patient
        Services. Jack Cunningham was the Director of Financial Analysis. David Frazer was
        the Vice President of Patient Services during the majority of the Relator's experience at
        AKF. Mike Spigler became involved in the process when David Frazer left the AKF in
        mid-2015, and quickly became aware of the operation.

49.     Plaintiff-Relator observed that all of these AKF officials acted contrary to the restrictions
        made by the OIG.

50.     Many of the practices became more blatant as time went on, but as early as 2008 and
        2009 the AKF was pressed for funds.

51.     As a result, the AKF would have to suspend sending funding for patients. Officials of the
        AKF including Dennis Cooper and Gwen Dewberry had conversations in front of the
        Plaintiff-Relator when they discussed Fresenius's and DaVita's reaction to this situation.

52.     Defendants Fresenius and DaVita asked the AKF why it was running out of funding as
        early as 2007.

53.     The AKF consistently went to these market leaders to obtain additional funding.
        According to these conversations, DaVita and Fresenius were asking why the AKF was
        letting all the providers use the program, when they were the ones providing most of the
        funds.

54.     The issue of DaVita and Fresenius being upset that they had to pay when other providers
        were not was a regular topic of discussions between Gwen Dewberry and Dennis Cooper.

55.     The Plaintiff-Relator overheard Dennis Cooper and Gwen Dewberry openly discussing
        that Fresenius and DaVita were questioning why AKF was running out of funding for
        Fresenius' and DaVita's patients, when they were making contributions at least 10 times

between 2007 and 2009.  Mr. Cooper twice mentioned this issue to Mr. Gonzalez directly in 2007.

56.     Mr. Gonzalez was responsible for issuing checks to pay for patients' premium payments, so when the AKF was out of funding, Cooper and Dewberry would instruct him not to issue checks.  Once Fresenius or DaVita or both would wire money for funding, the Plaintiff-Relator would then be instructed that he could resume issuing checks.

57.     Contrary to the conditions set forth on page 5 of the Advisory Opinion 97-1, the AKF has been taking into account the identity of the contributors by tracking, which provider was paying them and how much, for several years.

58.     Mr. Cunningham started formally tracking usage of the program in 2009.

59.     Prior to this, Gwen Dewberry ordered the Plaintiff-Relator to record every contribution submitted by providers on a spreadsheet as well as record every patient's name and amount of the grant.  With this information, she would label some providers as "Free Riders" because if the dollar amount of their patients' grant usage exceeded the contributions, then the spreadsheet would show that they were in the negative.

60.     The AKF acted to restrict grants only to patients whose providers paid contributions, which is also in violation of the OIG's conditions. *Cf.,* Advisory Opinion 97-1, p. 5.

61.     Methodist Hospital in Texas confronted the then VP of patient services Carol Lynn Halal in a conference phone call in 2007 with Dennis Cooper in which David Gonzalez also participated. The lawyers for Methodist Hospital told the AKF that they were not required to fund the program and were not going to fund the program.

62.     After this phone call Mr. Cooper told Mr. Gonzalez to make Methodist Hospital's applications disappear and said that Mr. Gonzalez should not process them.

19

63.   That meant any patients seeking dialysis treatment from Methodist Hospital would not be able to obtain AKF support for insurance payments. At the time, the applications were made via facsimile transmission and AKF officials had no difficulty in making applications for providers who did not donate "disappear."

64.   Of course, this is in direct contradiction of the requirement for the AKF to treat each application blindly and based on need on a first come first served basis, and not on whether the provider made a donation to AKF.

65.   In 2010, the AKF started a new grant management system which intensified this *qui pro quo* of patient support in exchange for donations. They created an online portal to accept applications for patients to receive funding.

66.   However, they did not stop discriminating against certain providers as a result. If anything, the Internet application made it much easier to aggregate information about what providers were donating and how to implement a more stringent system to approve financial support of patients whose providers made donations to AKF.

67.   The process of demanding funds from providers continued to intensify. AKF officials would tell new smaller providers who did not want to contribute or the patients who went to such facilities that it would be best for the patients to go to Fresenius and DaVita.

68.   Thus, AKF began driving business to its large provider funders instead of exercising autonomy as an independent charity.

69.   Notably, Gwen Dewberry specifically used the term "pay to play" regarding this process in front of the Plaintiff-Relator on a regular basis between 2014 and 2015.

70.   To further implement this scheme, the AKF set up a "blocked" list, which meant that any application from a patient using that provider would not receive funds until such time as the provider contributed to the program.

71.   The "blocked" list was referred to as such until 2015, when an AKF employee named Lynthia Williams, a Call Center Associate, took a call from a provider who had learned the provider was on this blocked provider list. The provider discovered they had been blocked and protested the action. The AKF's response was not to stop the practice, but to call the same list a "Training List" instead of the "blocked" list.

72.   The so-called "training" involved a call scheduled regularly for Tuesdays in which AKF officials would make it plain to the provider that they had to contribute to the AKF in order to have any of their patients receive funding. The substance of the training (which was really a *quid pro quo* solicitation of a donation in exchange for patient support) was the same regardless of whether the provider had been on a "blocked list" or a "training list."

73.   These "training calls" started in approximately 2012 and this program was also referred to internally as the "Recoupment Effort." The providers on the list were also commonly referred to as the "inequitables."

74.   Dealing with such providers was systematized into a collection schedule. Every Tuesday the AKF would have a call for up to two providers on the new or on the blocked list. The purpose of the call was to obtain funds from the provider that had not contributed.

75.   This was all conducted with specific amounts required to be paid as donations by the providers. David Frazer, AKF Vice President of Patient Services and Kidney Education,

would use terms such as "you owe (a certain amount) for this year and you have not paid for last year."

76.    The internal Grants Management System (GMS) had a report function so AKF officials could run a report by specific provider name that would tell them how much funding they had used based on all patient records associated with their facility name and amount of premium payments made on behalf of their patients.

77.    Mr. Cunningham would often use the following analogy in the training calls in explaining to providers on the "blocked" list what they were required to do as far as the AKF was concerned: if you take out buckets of water from a pool and don't replenish it, then the well runs dry. Therefore, Mr. Cunningham would tell providers that AKF needed them to replenish 100% of what they take out, plus five and three quarters for overhead expenses.

78.    The AKF also did not comply with the OIG Advisory Option No. 97-1 requirements to allow the coverage to follow the patient. As a specific example, in 2014 the AKF initially blocked funds to a patient who had previously been receiving them while that patient had been treated by a Fresenius branch in Florida because the new provider had not made a donation to AKF. The patient had been transferred from the Fresenius branch to Indiana University Health Adult Dialysis Center in Indianapolis, IN, and the social worker wrote:

> We recently had a patient transfer to us from a Fresenius unit in Florida. This patient had been receiving AKF funding for her Medicare supplement, which she was completely unable to pay on her own. Now that she is our patient, will she have to lose this assistance? Since she is not a new AKF patient, can we get her into the system as a patient at our unit now and allow her to keep receiving AKF funding? She will definitely lose the policy without AKF assistance, so I just wanted to see what we are able to do. Just let me know what you think. Thank you!
>
> Heather Kenjorski

Patient Transfer Email correspondence with the Plaintiff-Relator.

79.    Initially, Mr. Gonzalez replied by requesting patient information and telling Ms. Kenjorski to enter a new application. This is when she found her facility was not able to receive the funds for the patient. The social worker wrote back as follows:

> I am trying to input [patient name redacted] HIPP application on the AKF site and it won't allow me to do it. I have gotten the following message:
>
> "Your dialysis facility has not completed the proper GMS training which includes training of a financial representative. Please contact your dialysis administrator and/or financial representative to have this training completed."
>
> What should I do about this? Is this training that I need to complete?
>
> Thank you,
>
> Heather Kenjorski

*Id.*

80.    Given that part of the rationale in the OIG Advisory Opinion was that funding would not influence the patient's decision as to which provider to use, and that the funding was supposed to follow the patient and not the provider, this is a direct example that the AKF was not following the requirements of that opinion. *See* OIG, Advisory Opinion 97-1, p. 5.

81.    When that patient transferred from Fresenius to Indiana University Health the funding for the patient was denied so AKF could conduct "training" of the provider's "financial representative," which is how AKF characterized its demand that providers make donations in exchange for providing funding to the provider's patients.

82.    The Plaintiff-Relator was particularly sensitive to the rough treatment the AKF provided Kaiser Permanente.

23

83.   In 2015, the AKF blocked Kaiser Permanente and Jack Cunningham would not take a conference call with them until he was assured somebody on the call had authority to provide funds to the AKF. This was a particularly protracted collection that went on the entire last year the Plaintiff-Relator was working for the AKF.

84.   The AKF also knowingly favored DaVita and Fresenius in violation of the OIG's Advisory Opinion's restrictions beyond using the training calls to obtain funds from competitors. The Plaintiff-Relator heard Jack Cunningham and Dennis Cooper on phone calls directing social workers and patients to use Fresenius and DaVita if the provider had not contributed to the AKF. He specifically heard them say this to providers several times between 2014 and 2015.

**D.    Implications of Defendants' Knowing Violations.**

85.   The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

86.   Any inducement to favor one provider over another by the AKF would become illegal remuneration pursuant to OIG Advisory Opinion No. 97-1. Knowledge and participation by DaVita, Fresenius and any of the John Doe Defendants in any such step implicates them in the scheme as well.

87.   These providers were prohibited from pressuring the AKF to obtain funds from competitors, or contribute on any such basis without destroying the structure created in 1997 to make the entire program effectively a safe harbor from the Anti-Kickback Statute, pursuant to the terms of the OIG Advisory Opinion No. 97-1. However, both DaVita and Fresenius knowingly violated these restrictions.

88.   Indeed, given the size of the two companies (i.e., DaVita and Fresenius) who are leaders in the field, and who are major contributors to the AKF, it is not an exaggeration to say

24

that unrestrained, the Defendants could exert control over virtually the entire ESRD provider market.

89.  Defendants' adherence to the restrictions imposed by the OIG upon the AKF and providers regarding the operation of the fund was necessary to prevent such funds from being illegal inducements in violation of the Anti-Kickback Statute. Such knowing violations by Defendants can also be violations of the False Claims Act as well.

90.  Money given to patients under the AKF triggers vast amounts of payments to the providers charged for treatment through government programs. The AKF may provide support for a Medicare part B premium of $104.90 per month as well as support for supplemental insurance to cover the 20% co-payment under Part B.  That will cover a patient for the entire cost of ESRD treatment, which is generally 80% paid for by Medicare, for example.

91.  It is fair to say that $104.90 per month does not come close to paying the amount that the government ends up paying for ESRD treatment to the average recipient of AKF funds.

92.  It therefore makes economic sense for providers to participate in the program. Even if they spend 105.75% of what their patients receive in funds to the AKF, the providers are able to charge the vast majority of their dialysis treatments to government programs. That 105.75% is essentially a fractional cost of doing business for the providers to send some money to the patient so that the patient can obtain government funding for dialysis treatment to be spent on the providers.

93.  At the time Defendants submitted or caused to be submitted these false and fraudulent claims the Defendants knew that the government insurance programs would refuse

payment for these claims if the requirements of OIG Advisory Opinion No. 97-1 were not followed.

94.    This implicates the treatment of thousands of government-funded dialysis patients in a kickback scheme thereby creating excessive damages and extensive numbers of individual false claims paid by the government.

## IV.    FEDERAL AND STATE FALSE CLAIMS ACT VIOLATIONS

### COUNT I
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Submission of False Claims

95.    The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

96.    Solicitations made by the AKF and or paid by DaVita and Fresenius and any of the John Doe Defendants, based on any knowledge of patient funding violates the structure set forth in the OIG Advisory Opinion 97-1. Such solicitations and payments are done knowingly in violation of that structure and affect the decision by the patient as to which provider of End Stage Renal Disease treatments they use. Each such payment therefore, creates illegal remuneration and violations of the Anti-Kickback Statute, which punishes both the payer and the solicitor of such funds:

> **(1)** Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> **(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> **(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

**(2)** Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

**(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

**(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both..

42 U.S.C. § 1320a–7b(b).

97. Each such payment or solicitation made by the Defendants creates liability under the False Claims Act as the Anti-Kickback Statute provides:

In addition to the penalties provided for in this section or section 1320a–7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31.

42 U.S.C. § 1320a–7b(g).

98. These practices by Defendants DaVita, Fresenius, the John Doe Defendants and the AKF make a mockery of the OIG Advisory Opinion that was designed to separate the provision of charitable grant funding to patients from the financial influence of the providers. This kickback scheme creates a circle of a *quid pro quo* solicitation of donations in exchange for payments and incentives, which has been continually creating false claims in violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(A) at the expense of government programs.

99. Defendants knowingly violated the requirements of OIG Advisory Opinion No. 97-1, and Defendants were aware that compliance with those requirements was material to the

government's decision to pay claims submitted or caused to be submitted by Defendants.

100.    As a direct and proximate result of Defendants' knowing violations of the False Claims Act, the Defendants are liable to the United States for three times the amount of damages they have created to the United States as a result of submitting, or causing to submit, these false claims.

101.    Each and every such violation of the Federal False Claims Act is also subject to a civil fine under the False Claims Act of between $5,500-$11,000, for conduct occurring prior to November 2, 2015, and a civil fine of between $10,781 and $21,563, for conduct occurring after November 2, 2015. *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition Defendants are liable for any increase as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990. Defendants are also liable for similar penalties for each violation of the State False Claims Acts.

## COUNT II
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### Use of False Statements or Records

102.    The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

103.    In submitting or causing to submit false claims the Defendants necessarily created false records and false statements including, but not limited to submitting bills to government programs, which require adherence to the Anti-Kickback Statute and by maintaining that they were in compliance with laws and regulations regarding the provision of ESRD services.

104.    Defendants therefore violated the False Claims Act prohibition against using false records and statements under 31 U.S.C. § 3729(a)(1)(B).

28

105.   The Defendants are liable to the United States for three times the amount of damages they have created to the United States as a result of using false records and statements.

106.   Each and every such violation of the Federal False Claims Act is also subject to a civil fine under the False Claims Act of between $5,500-$11,000, for conduct occurring prior to November 2, 2015, and a civil fine of between $10,781 and $21,563, for conduct occurring after November 2, 2015. *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition, Defendants are liable for any increase as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990. Defendants are also liable for similar penalties for each violation of the State False Claims Acts.

## COUNT III
### Violations of Cal. Gov't Code §§ 12650 *et seq.*
### The California False Claims Act

107.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

108.   This is a claim for treble damages and civil penalties under the Cal. Gov't Code §§12650 *et seq.*

109.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services.

110.   As a result, Defendants knowingly presented or caused to be presented false claims to the California Medicaid program (Medi-Cal), as well as programs funded by California and its political subdivisions, as defined under the California False Claims Act for health care plans of their employees.

111.   Defendants knowingly accomplished these unlawful acts by making, using or causing false records or statements to be used in support of false claims.

112.    The California Medicaid Program and any additional program paying for ESRD services with California State funds or funds from the political subdivisions of California were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been paid.

113.    By reason of these payments California has been damaged and continues to be damaged in an amount to be determined at trial.

**COUNT IV**
**Violations of Colo. Rev. Stat. §§ 25.4-4-303.4 *et seq.***
**The Colorado False Claims Act**

114.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

115.    This is an action for treble damages and civil penalties for violations of The Colorado False Claims Act, Colo. Rev. Stat. §§ 25.4-4-303.4 *et seq.*

116.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services.

117.    As a result Defendants knowingly presented or caused to be presented false claims to the Colorado Medicaid program, and to programs funded by Colorado and its political subdivisions, to cover health care costs for their employees.

118.    Defendants knowingly accomplished these unlawful acts by making, using or causing the use of false records or statements.

119.    The Colorado Medicaid Program and any additional program paying for ESRD services with funds from the state of Colorado or its subdivisions were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been paid.

30

120.   By reason of these payments Colorado has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT V
### Violations of Conn. Gen. Stat. §§ 17b-301a--17b-301p (2010 Supplement)
### The Connecticut False Claims Act

121.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

122.   This is an action for treble damages and civil penalties for violations of the Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301a--17b-301p (2010 Supplement).

123.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services.

124.   As a result Defendants knowingly presented or caused to be presented false claims to the Connecticut Medicaid program, and to programs funded by the state of Connecticut as well as its political subdivisions, to support the health care of their employees.

125.   Defendants knowingly accomplished these unlawful acts by making using or causing to the use of false records or statements.

126.   The Connecticut Medicaid Program and any additional program paying for ESRD Services with Connecticut State funds, or funds from a political subdivision of the State, were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been paid.

127.   By reason of these payments Connecticut has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT VI
### Violations of DC Code, §§ 2-381.01 *et seq.*
### The District of Columbia False Claims Act

128.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

129.   This is an action for treble damages and civil penalties for violations of District of Columbia False Claims Act, DC Code §§ 2-381.01 *et seq.*

130.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services.

131.   As a result Defendants knowingly presented or caused to be presented false claims to the District of Columbia's Medicaid program, and to programs paying for health care costs employees of the District of Columbia.

132.   Defendants knowingly accomplished these unlawful acts by making using or causing the use of false records or statements.

133.   The District of Columbia's Medicaid Program, and any additional program paying for ESRD services with District of Columbia funds, were unaware of the falsity or fraudulent nature of these claims.  Such claims otherwise would not have been paid.

134.   By reason of these payments the District of Columbia has been damaged and continues to be damaged in an amount to be determined at trial.

**COUNT VII**
**Violations of Del. Code Ann. tit. 6, §§ 1201 *et seq.***
**The Delaware False Claims and Reporting Act**

135.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

136.   This is an action for treble damages and civil penalties for violations of Section 1201(a) of the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*

137.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services.

138.    As a result Defendants knowingly presented or caused to be presented false claims to Delaware's Medicaid program, and to programs funded by the Government of Delaware as defined under the Delaware False Claims and Reporting Act to include all political subdivisions and all Government organizations.

139.    Defendants knowingly accomplished these unlawful acts by making, using or causing the use of false records or statements.

140.    The State of Delaware's Medicaid Program, and any additional program paying for ESRD services with funds from political subdivisions of the State of Delaware or from the State of Delaware, were unaware of the falsity or fraudulent nature of these claims.

141.    Such claims otherwise would not have been paid.

142.    By reason of these payments the State of Delaware has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT VIII
### Violations of O.C.G.A. § 23-3-120 (2012), *et seq.*
### The Georgia Taxpayer Protection False Claims Act

143.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

144.    This is an action for treble damages and civil penalties for violations of The Georgia Taxpayer Protection False Claims Act, O.C.G.A. § 23-3-120 (2012), *et seq.*

145.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

33

146.  Defendants therefore knowingly presented or caused to be presented false claims to the Georgia's Medicaid program.

147.  The Georgia Medicaid Program was unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

148.  By reason of these payments the State of Georgia has been damaged and continues to be damaged in a substantial amount to be determined at trial in an amount to be determined at trial.

## COUNT IX
### Violations of Haw. Rev. Stat. Ann. §§ 661-21 *et seq.*
### The Hawaii False Claims Act

149.  The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

150.  This is an action for treble damages and civil penalties for violations of the Hawaii False Claims Act, Haw. Rev. Stat. Ann. §§ 661-21 *et seq.*

151.  Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

152.  As a result Defendants knowingly presented or caused to be presented false claims to Hawaii's Medicaid program and to programs funded by Hawaii, and its political subdivisions, to pay health care costs for their employees.

153.  Defendants knowingly accomplished these unlawful acts by making, using or causing to the used of false records or statements.

154.  The Hawaii Medicaid Program, and any additional program paying for ESRD services with funds from Hawaii, or one of the political subdivisions of the State, were unaware of

the falsity or fraudulent nature of the claims paid. Such claims otherwise would not have been allowed.

155. By reason of these payments the State of Hawaii has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT X
## Violations of 740 Ill. Comp. Stat. Ann. 175/1 *et seq.*
## The Illinois False Claims Act

156. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

157. This is an action for treble damages and civil penalties for violations of The Illinois False Claims Act, 740 Ill. Comp. Stat. Ann. 175/1 *et seq.*

158. Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

159. As a result Defendants knowingly presented or caused to be presented false claims to the Illinois' Medicaid program, and to programs funded by the State of Illinois as defined under the Illinois False Claims Act including, but not limited to, political subdivisions and Municipalities.

160. Defendants knowingly accomplished these unlawful acts by making, using or causing the use of false records or statements.

161. The Illinois Medicaid Program, and any additional program using Illinois Funds, or funds from any subdivision of the State of Illinois were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

162.   By reason of these payments the State of Illinois has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT XI
### Violations of Ind. Code §§ 5-11-5.5 *et seq.*
### The Indiana False Claims and Whistleblower Protection Act

163.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

164.   This is an action for treble damages and civil penalties for violations of The Indiana False Claims Act, Ind. Code §§ 5-11-5.5 *et seq.*

165.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

166.   As a result Defendants knowingly presented or caused to be presented false claims to the Indiana Medicaid program and to other programs funded by the state of Indiana.

167.   Defendants knowingly accomplished these unlawful acts by making, using or causing the use of false records or statements.

168.   The Indiana Medicaid Program and any additional Indiana programs paying for ESRD Services, were unaware of the falsity or fraudulent nature of the claims and paid those claims. Such claims otherwise would not have been allowed.

169.   By reason of these payments the State of Indiana has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT XII
### Violations of Iowa Code § 685.1 *et seq.*
### The Iowa False Claims Act

170.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

171.    This is an action for treble damages and civil penalties for violations of The Iowa False Claims Act Iowa Code § 685.1 *et seq.*

172.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

173.    As a result Defendants knowingly presented or caused to be presented false claims to the Iowa Medicaid program.

174.    Defendants knowingly accomplished these unlawful acts by making, using or causing the use of false records or statements.

175.    The Iowa Medicaid Program was unaware of the falsity or fraudulent nature of the claims, and paid the claims. Such claims otherwise would not have been allowed.

176.    By reason of these payments the State of Iowa has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT XIII**
**Violations of La. Rev. Stat. Ann. §§ 6:438.1 *et seq.***
**The Louisiana Medical Assistance Program Integrity Law**

177.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

178.    This is an action for treble damages and civil penalties for violations of the Louisiana Medical Assistance Program Integrity Law, La. Rev. Stat. Ann. §§ 6:438.1 *et seq.*

179.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

180.    As a result Defendants knowingly presented or caused to be presented false claims to the Louisiana Medicaid program.

181.    Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

182.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims paid for claims. Such claims would otherwise not have been allowed.

183.    By reason of these payments the State of Louisiana has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT XIV**
**Violations of Md. Code Ann. Health-Gen. §§ 2-601 *et seq.***
**The Maryland False Health Claims Act of 2010 and**
**Md. Code Ann. Gen. Prov. §§ 8-101 *et seq.***
**The Maryland False Claims Act**

184.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

185.    This is an action for treble damages and civil penalties for violations of the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. §§ 2-601 *et seq.*, and the Maryland False claims Act Md. Code Ann. Gen. Prov. §§ 8-101 *et seq.*

186.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

187.   As a result Defendants knowingly presented or caused to be presented false claims to Maryland state health plans or programs, the State of Maryland and Counties of the State of Maryland.

188.   Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

189.   Maryland state health plan or programs, the State and Counties, unaware of the falsity or fraudulent nature of the claims, paid these ESRD related claims. Such claims otherwise would not have been allowed.

190.   By reason of these payments the State of Maryland and Counties have been damaged and continue to be damaged in a substantial amount to be determined at trial.

**COUNT XV**
**Violations of Mass. Ann. Laws ch.12, §§ 5 *et seq.***
**The Massachusetts False Claims Act**

191.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

192.   This is an action for treble damages and civil penalties for violations of the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, §§ 5 *et seq.*

193.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

194.   As a result Defendant knowingly presented or caused to be presented false claims to the Massachusetts Medicaid program, as well as other programs funded by Massachusetts and its subdivisions.

195. Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

196. The Massachusetts Medicaid Program and any additional program funded by Massachusetts and its subdivisions were unaware of the falsity or fraudulent nature of the claims. Those programs paid for claims that otherwise would not have been allowed.

197. By reason of these payments the Commonwealth of Massachusetts and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT XVI
### Violations of Mich. Comp. Laws. Serv. §§ 400.601 *et seq.*
### The Michigan Medicaid False Claims Act

198. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

199. This is an action for treble damages and civil penalties for violations of the Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. §§ 400.601 *et seq.*

200. Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

201. As a result Defendants knowingly presented or caused to be presented false claims to the Michigan Medicaid program and or the Michigan Department of Community Health.

202. Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

203. The Michigan Medicaid Program and Department of Community Health, were unaware of the falsity or fraudulent nature of the claims, and paid for claims. Such claims otherwise would not have been allowed.

204. By reason of these payments the State of Michigan has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT XVII
### Violations of Minn. Stat. §§ 15C.01 *et seq.*
### The Minnesota False Claims Act

205. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

206. This is an action for treble damages and civil penalties for violations of the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*

207. Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

208. As a result Defendants knowingly presented or caused to be presented false claims to the state of Minnesota, political subdivisions of the State of Minnesota and programs funded by Minnesota and its subdivisions.

209. Defendants knowingly accomplished these unlawful acts by making, using, or causing to be used a false record or statement.

210. The State of Minnesota and any program funded by Minnesota or its subdivisions were unaware of the falsity or fraudulent nature of the claims. These programs therefore paid for claims that otherwise would not have been allowed.

211.   By reason of these payments the State of Minnesota and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT XVIII
### Violations of Mont. Code Ann. §§ 17-8-401 *et seq.*
### The Montana False Claims Act

212.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

213.   This is an Action for treble damages and civil penalties for violations of the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*

214.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

215.   As a result Defendants knowingly presented or caused to be presented false claims to Montana, and "Government entities" of the State of Montana as defined in the Montana False Claims Act.

216.   Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

217.   The State of Montana and Montana Government entities were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

218.   By reason of these payments the State of Montana and its Government entities have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT XIX
### Violations of Nev. Rev. Stat. Ann. §§357.010 *et seq.*
### The Nevada Submission of False Claims to State or Local Government Act

219.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully
        above.

220.    This is an action for treble damages and civil fines for violations of the Nevada
        Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. §§
        357.010 *et seq.*

221.    Defendants engaged in a kickback scheme to direct payments of insurance and
        copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false
        claims.

222.    As a result Defendants knowingly presented or caused to be presented false claims to the
        state of Nevada, as well as programs funded by Nevada and its Political Subdivisions as
        defined under the Nevada False Claims to State and Local Government Act.

223.    Defendants knowingly accomplished these unlawful acts by making, using, or causing
        the use of false records or statements.

224.    The state of Nevada and its political subdivisions were unaware of the falsity or
        fraudulent nature of the claims. Such claims otherwise would not have been allowed.

225.    By reason of these payments the State of Nevada and its political subdivisions have been
        damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT XX
### Violations of N.J. Stat. Ann. § 2A:32C-1 *et seq.*
### The New Jersey False Claims Act

226.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully
        above.

227.    This is an action for treble damages and civil fines under the Section 2A:32C-3 of the
        New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*

228. Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

229. As a result Defendants knowingly presented or caused to be presented false claims to the State of New Jersey and programs funded by the State of New Jersey as "State" is defined under the New Jersey False Claims Act.

230. Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

231. The State of New Jersey and programs funded by the State of New Jersey were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

232. By reason of these payments the State of New Jersey has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT XXI**
**Violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.***
**The New Mexico Medicaid False Claims Act and**
**N.M. Stat. Ann. §§ 44-9-1 *et seq.***
**The New Mexico Fraud Against Taxpayers Act**

233. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

234. This is an action for treble damages and civil fines under The New Mexico Medicaid False Claims Act and New Mexico Fraud Against Taxpayers Act N.M. Stat. Ann. §§ 27-14-1 *et seq.*

235.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

236.   As a result Defendants knowingly presented or caused to be presented false claims to the New Mexico Medicaid program, as well as programs funded by The State of New Mexico as defined under the New Mexico Fraud Against Taxpayers Act.

237.   Defendants knowingly accomplished these unlawful acts by making, using or causing the use of false records or statements.

238.   The New Mexico Medicaid Program and other programs funded by the State of New Mexico were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

239.   By reason of these payments the State of New Mexico has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT XXII**
**Violations of N.Y. State Fin. Law §§ 188 *et seq.***
**The New York False Claims Act**

240.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

241.   This is an action for treble damages and civil fines under the New York False Claims Act. N.Y. State Fin. Law §§ 188 *et seq.*

242.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

243.    As a result Defendants knowingly presented or caused to be presented false claims to the New York Medicaid program, as well as programs funded by the State of New York and programs funded by Local Governments of the State as defined under the New York False Claims Act.

244.    Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

245.    The New York Medicaid Program and other programs funded by New York State and New York Local Governments were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

246.    By reason of these payments the State of New York and Local Governments have been damaged and continue to be damaged in a substantial amount to be determined at trial.

### COUNT XXIII
### Violations of N.C. Gen. Stat. §§ 1-605 *et seq.*
### The North Carolina False Claims Act

247.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

248.    This is an action for treble damages and civil fines against the Defendants under The North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*

249.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

250.    As a result Defendants knowingly presented or caused to be presented false claims to North Carolina and programs funded by the State of North Carolina.

251. Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

252. The State of North Carolina and programs funded by the State of North Carolina were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

253. By reason of these payments the State of North Carolina has been damaged and continues to be damaged in a substantial amount to be determined at trial.

### COUNT XXIV
### Violations of Okla. Stat. tit. 63, §§ 5053 *et seq.*
### The Oklahoma Medicaid False Claims Act

254. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

255. This is an action for treble damages and civil fines against the Defendants under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*

256. Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

257. As a result Defendants knowingly presented or caused to be presented false claims to Oklahoma and programs funded by the State of Oklahoma.

258. Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

259. The State of Oklahoma and programs funded by the State of Oklahoma were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

260.    By reason of these payments the State of Oklahoma has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT XXV
### Violations of R.I. Gen. Laws §§ 9-1.1-1 *et seq.*
### The Rhode Island False Claims Act

261.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

262.    This is an action for treble damages and civil fines against Defendants under The Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*

263.    Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

264.    As a result Defendants knowingly presented or caused to be presented false claims to the State of Rhode, as well as programs funded by the State of Rhode Island as defined under the Rhode Island False Claims Act to include all Rhode Island agencies, government entities, cities, towns.

265.    Defendants also knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

266.    The State of Rhode Island and programs funded by the State of Rhode Island were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

267.    By reason of these payments the State of Rhode Island has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT XXVI
### Violations of T.C.A. §§ 4-18-101 et seq.
### The Tennessee False Claims Act
### and T.C.A. §§ 71-5-181 *et seq.*
### and Tennessee Medicaid False Claims Act

268.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

269.   This is an action for treble damages and civil fines against the Defendants under T.C.A §§ 4-18-101 *et seq.*, the Tennessee False Claims Act and T.C.A. §§ 71-5-181 *et seq.* the Tennessee Medicaid False Claims Act.

270.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

271.   As a result Defendants knowingly presented or caused to be presented false claims to the Tennessee Medicaid program, as well as programs funded by Tennessee and its political subdivisions as defined under the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act.

272.   Defendants knowingly accomplished these unlawful acts by making, using. or causing the use of false records or statements.

273.   The Tennessee Medicaid Program and other programs funded by Tennessee and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

274.   By reason of these payments the State of Tennessee and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

### COUNT XXVII
### Violations of Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*
### The Texas Medicaid Fraud Prevention Act

275.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully
        above.

276.    This is an action for treble damages and civil fines against the Defendants under the
        Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*

277.    Defendants engaged in a kickback scheme to direct payments of insurance and
        copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false
        claims.

278.    As a result Defendants knowingly presented or caused to be presented false claims to the
        Texas Medicaid program, and or knowingly accomplished these unlawful acts by making
        using or causing to be used a false record or statement.

279.    The Texas Medicaid Program was unaware of the falsity or fraudulent nature of the
        claims. Texas therefore paid for claims that otherwise would not have been allowed.

280.    By reason of these payments the State of Texas has been damaged and continues to be
        damaged in a substantial amount to be determined at trial.

### COUNT XXVIII
### Violations of 32 VSA §§ 630 *et seq.*
### The Vermont False Claims Act

281.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully
        above.

282.    Plaintiff-Relator seeks relief against Defendants under the Vermont False Claims Act, 32
        VSA §§ 630 *et seq.*

50

283. Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

284. As a result Defendants knowingly presented or caused to be presented false claims to the Vermont Medicaid program, as well as programs funded by the State of Vermont as defined under the Vermont False Claims Act to include, any agency of state government, and any political subdivision.

285. Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

286. The Vermont Medicaid Program and other Vermont programs were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

287. By reason of these payments the State of Vermont and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT XXIX
### Violations of Va. Code Ann. §§ 8.01-216.1 *et seq.*
### The Virginia Fraud Against Taxpayers Act

288. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

289. Plaintiff-Relator seeks relief against Defendants under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

290.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

291.   As a result Defendants knowingly presented or caused to be presented false claims to the Virginia Medicaid program, as well as programs funded by the Commonwealth of Virginia as defined under the Virginia Fraud Against Taxpayers Act to include, any agency of state government, and any political subdivision.

292.   Defendants knowingly accomplished these unlawful acts by making, using, or causing to the use of false records or statements.

293.   The Virginia Medicaid Program and other Commonwealth of Virginia programs were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

294.   By reason of these payments the Commonwealth of Virginia has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT XXX
### Violations of RCW 74.66.005 *et seq.*
### The Washington Medicaid Fraud Act

295.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

296.   This is an action for treble damages and civil fines against the Defendants under The Washington Medicaid Fraud Act RCW 74.66.005 *et seq.*

297.   Defendants engaged in a kickback scheme to direct payments of insurance and copayments for End Stage Renal Dialysis ("ESRD") services thereby creating false claims.

298.    As a result Defendants knowingly presented or caused to be presented false claims to the Washington Medicaid program.

299.    Defendants knowingly accomplished these unlawful acts by making, using, or causing the use of false records or statements.

300.    The State of Washington was unaware of the falsity or fraudulent nature of the claims. The State therefore paid for claims that otherwise would not have been allowed.

301.    By reason of these payments the State of Washington has been damaged and continues to be damaged in a substantial amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of himself, the United States, and all States listed herein request that judgment be entered in his favor and against Defendants as follows:

(a)    That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*, and the counterpart provisions of the State False Claims Acts set forth above;

(b)    Plaintiff-Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and the maximum amount allowed pursuant to the State False Claims Act statutes;

(c)    That in the event the United States Government continues to proceed with this action, the Plaintiff-Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of any award or the settlement of the claims;

(d)    That in the event the United States Government does not proceed with this action, the Plaintiff-Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of any award or settlement;

(e) That this Court enter judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 of between $5,500-$11,000, for each violation of 31 U.S.C. § 3729 occurring prior to November 2, 2015, and a civil fine of between $10,781 and $21,563, for such conduct occurring after November 2, 2015. *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition Defendants are liable for any increase in civil fines as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus the appropriate amount to the States for damages and civil fines as determined under the above listed State False Claims Acts;

(f) That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall not be less than 15% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(g) That Plaintiff-Relator be granted a trial by jury;

(h) That Plaintiff-Relator, the United States, and the States listed herein be awarded pre-judgment interest;

(i) That the Plaintiff-Relator, be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and similar provisions of the Sate False Claims Acts listed herein.

(j) The United States, the States, sub-divisions or municipalities and the Plaintiff-Relator recover such other relief as the Court deems just and proper

**JURY TRIAL DEMANDED**

Respectfully submitted,

KOHN, KOHN & COLAPINTO, LLP

David K. Colapinto
BBO # 551835
3233 P Street, N.W.
Washington, D.C.  20007-2756
Email:  dc@kkc.com
Phone:  202-342-6980
Fax:      202-342-6984


-    and –


PRICE BENOWITZ, LLP

Anthony C. Munter
BBO #600016
409 7th Street, N.W.
Washington, DC 20004
Email:  tony@pricebenowitz.com
Phone: 202-417-6000
Fax:     202-664-1331

Attorneys for Plaintiff-Relator

September 7, 2016

55